(C.D. 3791)

ENGLEHARDT INDUSTRIES, INC. *v* UNITED STATES

United States Customs Court, Third Division

(Decided April 16, 1969)

*Barnes, Richardson & Colburn* (*E. Thomas Honey* of counsel) for the plaintiff.
*William D. Ruckelshaus*, Assistant Attorney General (*Morris Braverman*, trial attorney), for the defendant.

Before RICHARDSON and LANDIS, Judges

LANDIS, Judge: Plaintiff imported palladium concentrate from Canada, and here protests the classification made thereof by the customs officials under the Tariff Act of 1930.

The palladium concentrate was classified by the defendant as an earthy or mineral substance, wholly or partly manufactured, not specially provided for, dutiable at 15 per centum ad valorem, under paragraph 214 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802. Plaintiff claims the palladium concentrate should be classified as a metallic substance in the crude state, such as drosses, skimmings, residues, brass foundry ash, and flue dust, not specially provided for, free of duty under paragraph 1664 of the Tariff Act of 1930. An alternative duty free claim under paragraph 1699 has not been pressed and is deemed abandoned.

Plaintiff's claimed classification makes it necessary to determine whether the palladium concentrate contains metal as such, and whether it is a substance like or similar to, or belongs to the same class as the substances named in paragraph 1664, namely, drosses, skimmings, residues, brass foundry ash, and flue dust. *United States* v. *Nichols Copper Co.*, 29 CCPA 186, C.A.D. 190; *Philipp Bros. Ore Corp.* v. *United States*, 45 Cust. Ct. 64, C.D. 2199; *Philipp Bros., Inc.* v. *United States*, 45 Cust. Ct. 190, C.D. 2222. It is undisputed that the palladium concentrate contains metal as such. (R. 20.) "Paragraph 1664 clearly does not include *all* metallic mineral substances in a crude state, but only those 'such as drosses, skimmings, residues, brass foundry ash, and flue dust' containing metal." [Emphasis quoted.] *United States* v. *Nichols Copper Co., supra*, at page 189. We next examine the record for evidence that the palladium concentrate is a metallic mineral substance such as drosses, skimmings, residues, brass foundry ash, and flue dust.

Defendant adduced no direct evidence. Two witnesses, both associated with Englehardt Industries, Inc. (hereinafter Englehardt), testified for plaintiff. The crucial testimony is that of Dr. Theodore Papademetriou, vice-president and manager of Englehardt's Refining Division. He testified that he had been with Englehardt for over 30 years; that he received a Ph. D. in chemistry from the University of Leipzig, Germany, and that he belongs to the American Chemical Society and to the American Chemists and Microchemical Society. His stated work with Englehardt is to refine all the platinum and metals of the platinum group, plus gold and silver and, more recently, copper and nickel. He was, he said, familiar with the palladium concentrate herein, imported in metal containers, and described its physical appearance as a powder, rather gray, dark-looking, with the particles a little bit on the uneven side. (R. 16.)

Palladium concentrate, said Dr. Papademetriou, is derived by an electrolytic process used to refine copper, silver, and gold. He stated that he was familiar with the process having seen it in Germany before the Second World War and in Sheffield, England, during the Second World War. The Englehardt plant, which he is in charge of, uses the process with similar results.

Electrolysis, we are informed:

> * * * is concerned not only with the refining of metals but also plays an integral part in the operational recovery (winning) of many metals, and thus it can be conveniently considered from these two aspects.
>
> In electro-refining the metal to be refined is made the anode of the system, pure metal being deposited at the cathode under electrolytic action. The impurities associated with the metal either remain behind, attached to the anode, or fall off and form a slime at the bottom of the cell.
>
> The reaction is based upon the fact that if two metals are placed in an appropriate solution and a direct current passed from one metal (the anode) to the other (cathode) the former dissolves, the latter showing a corresponding increase in weight. The metal dissolved from the anode acts as a carrier of the current and on reaching the cathode gives up its charge and deposits thereon. The behaviour of the impurities associated with the metal depends largely on whether they stand higher or lower in the electromotive-force series than the metal undergoing electrolysis. In general those metallic impurities standing higher in the series than the metal dissolve whilst those standing lower tend to precipitate. [W. H. Dennis, *Metallurgy of the Non-Ferrous Metals*, p. 36 (1954).]

Dr. Papademetriou testified, on direct examination, that when copper is electrolytically refined the copper is taken off leaving impurities consisting of silver, gold, and other metals, also some copper. The impurities dissolve into what he called copper slime. The slime, after it

is variously processed to free it of copper, is subjected to a furnace treatment to remove the remaining impurities from the silver and gold and leave a pure doré silver metal. The silver is in turn electrolytically refined leaving a silver slime which consists of gold, platinum, palladium, and some silver because you cannot "get it all out; you get about 90 per cent out." (R. 22.) The silver slimes are subjected to a wet treatment with sulphuric acid to remove the silver. The gold in the slime is then cast into anodes and electrolyzed to remove the gold "and the platinum, palladium, plus very little silver and gold remain in solution" (R. 22) or so-called electrolyte. The platinum, palladium, and other metals are precipitated out of the solution with the addition of zinc powder. The purpose of the process, said Dr. Papademetriou, is first to gain the copper, which is present in the greatest quantity, then the silver, then the gold, and last the palladium and platinum which is the smallest amount. (R. 23.) At completion of the process, he said, "you have the residues of the platinum and palladium, those concentrates." (R. 24.)

Dr. Papademetriou testified that when Englehardt gets the concentrates in its refinery the material is ground, sieved through a 40-mesh and put in a mechanical blender, mixed for one-half hour and a sample drawn for assay.

Mr. Harry H. Mortimer, in charge of purchasing for Englehardt, testified that an assay is necessary because the unit price per ounce which Englehardt agreed to pay was based on the quantity of platinum and palladium contained in the imported concentrate reported in an assay certificate executed after the importation is assayed. Mr. Mortimer also stated that he reported the following quantities in the assay which he certified and executed for the various protest entries:

| Entry | Platinum | Palladium |
|-------|----------|-----------|
| 316 | 3. 66% | 67% |
| 458 (fine) | 3. 45% | 74. 93% |
| 458 (course) | 3. 30% | 74. 10% |
| 360 | 3. 60% | 65. 20% |

After the concentrate is assayed, Dr. Papademetriou testified that it is put in a solution with a mixture of hydrochloric acid and nitric acid in water which separates the palladium; that the solution is filtered and out of the solution the palladium is converted into a monopalladium chloride, and that the remaining platinum which has not been precipitated through regular procedures is filtered out and then rerun. Here again, said Dr. Papademetriou, the purpose is to separate and purify the platinum and palladium and get rid of the base metal which is present in small amounts, about 10 percent in the form of traces of copper, silver, gold, tin, iron, zinc, silicon, and alumina, of no value to Englehardt.

Defendant cross-examined Dr. Papademetriou somewhat more closely on the standard process described in his direct testimony, and was told that the copper slimes are filtered, given an oxidizing roast, fed into tanks where the slime is leached with sulphuric acid, causing the copper sulphides to chemically react and oxidize with the copper oxide in the "chain roaster." Asked if there was a physical treatment of the solution in the chain roaster, Dr. Papademetriou stated that he did not understand the process to be physical treatment because, in his opinion, physical treatment is a conversion of something by melting or pyre reaction. He would call what took place a pyrochemical reaction followed by leaching in a water tank, and either a further leaching with caustic soda in a caustic leach tank or, as some do, a furnace treatment with sodium hydroxide where the chemical reaction draws off selenium and tellurium in the slime.

After the furnace treatment Dr. Papademetriou stated that what is left is a pure doré silver metal, 90 percent silver, 10 percent gold, with platinum and palladium. The silver metal is cast and electrolytically refined to get the silver out causing a silver slime or "gold mud". The silver slime is dissolved in a hot sulphuric acid and the chemical reaction from this treatment causes the silver in the slime to go into solution leaving the gold and other metals.

Dr. Papademetriou next described the electrolytical refining process, using an anode and cathode to remove the gold. The gold anode is placed in hydrochloric acid and the gold is removed in the chemical reaction to the acid. The gold electrolyte solution enriched with platinum and palladium, is removed, sulphur dioxide is added and additional gold is precipitated, after which the solution is filtered leaving in it small traces of unprecipitated gold, a little silver chloride and platinum and palladium as chloride. Zinc powder is added "to precipitate platinum in with palladium, and leave iron and all the other metals which do not precipitate in that way back." (R. 32.) The zinc powder, said Dr. Papademetriou, cements the palladium and platinum.

Dr. Papademetriou closed his cross and direct examination with testimony that ten or twelve different processes are involved in arriving at the imported palladium concentrate; that precipitation through chemical processes, is manufacturing, if you want to stretch a point; that he would call the chemical processes working steps in obtaining the imported concentrate; that you can call the imported concentrate "really an ash at the end" (R. 33) ; it is similar to flue dust, but not drosses or skimmings; it is a concentrate and more of a by-product of the various processes. Asked if he made a distinction between a residue and a concentrate, Dr. Papademetriou stated that "this particular product [palladium concentrate], I would say this is the residue of all the operations that they make of the cooper refining and in a concentrated form. I might describe it better this way." (R.

36.) The only purpose of the imported concentrate, he said, is to extract the palladium and platinum and in this sense it was not an unwanted product.

Both sides make direct argument on the facts. Plaintiff urges that the processes described by Dr. Papademetriou support the fact that the palladium concentrate is a metallic mineral substance in a crude state, to wit, the residue left over from refining copper, silver, and gold. Defendant contends that, on the same facts, there is no question but that the palladium concentrate is a mineral substance, wholly or partly manufactured.

One of the shortcomings in this record is the lack of facts on the process by which the palladium became concentrated in the imported powder form. The palladium, and other residual metals, may be the residue from final gold refining processes. But whether it is the untreated residue to which paragraph 1664 speaks or is a treated residue, as with zinc powder, which may make the residue something else, *Philipp Bros. Ore Corp.* v. *United States*, 45 Cust. Ct. 64, C.D. 2199, is far from clear.

Dr. Papademetriou's testimony further suggests that chemical reactions or processes are involved in the refinings from which the palladium concentrate is derived. Again, whether the chemical reactions merely induce a precipitation of metal or do something more substantial, the record does not say. A concentrate, however, must be the product of a process which involves no substantial chemical change. *United States* v. *C. J. Tower & Sons*, 43 CCPA 49, C.A.D. 608.

On this record, we hold that plaintiff has failed to overcome the presumptively correct classification of the palladium concentrate as a mineral substance, wholly or partly manufactured, under paragraph 214. *A. Millner Co.* v. *United States*, 46 CCPA 97, C.A.D. 706.

The protest claim under paragraph 1664 is overruled. The claim under paragraph 1669 is dismissed. Judgment will enter accordingly.